**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CRYSTAL L. MANCUSO, )<br>)<br>Plaintiff, )<br>)       Civil Action No. 04-293 Erie<br>)<br>v. )<br>)<br>JO ANNE BARNHART, )<br>Commissioner of Social Security, )<br>)<br>Defendant. ) | |

**MEMORANDUM OPINION**

McLAUGHLIN, SEAN, J.

Plaintiff, Crystal L. Mancuso, commenced the instant action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security, who found that she was not entitled to supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. Mancuso filed an application for SSI on April 7, 2003 alleging disability since March 1, 2003 due to a hearing problem, a lack of comprehension, being "slow" and back problems (Administrative Record, hereinafter "AR", at 72-73, 83). Her application was denied initially, and Mancuso requested a hearing before an administrative law judge ("ALJ") (AR 54-57, 62). A hearing was held on July 1, 2004, and following this hearing, the ALJ found that Mancuso was not disabled at any time through the date of his decision, and therefore was not eligible for SSI benefits (AR 15-21, 29-51). Mancuso's request for review by the Appeals Council was denied (AR 7-10), rendering the Commissioner's decision final under 42 U.S.C. § 405(g). The instant action challenges the ALJ's decision. Presently pending before the Court are cross-motions for summary judgment. For the reasons that follow, both motions shall be denied.

**I. BACKGROUND**

Mancuso was born on May 11, 1978 and was twenty-six years old on the date of the ALJ's decision (AR 15, 72). She had a high school education, with no past relevant work history (AR 15). Mancuso has claimed disability due to both physical and mental impairments.

   A.   *Mental impairments*

Mancuso began treatment at Stairways Behavioral Health Outpatient Clinic in April 2003 for complaints of depression and mood instability (AR 142-145). She underwent a psychiatric evaluation by Sean Su, M.D., on April 17, 2003 and reported a history of a psychiatric hospitalization when she was 13 years old following a suicide attempt (AR 142). She denied current suicidal ideation, but reportedly felt suicidal in the past few months (AR 143). She had three children, who reportedly had been taken away from her by the Office of Children and Youth due to her refusal to pursue mental health treatment (AR 143). She claimed she was in special education classes at school because of a learning disability (AR 143).

Mancuso complained of a dysphoric mood, insomnia, poor energy level, poor motivation, anhedonia, difficulty concentrating, increased anxiety, increased irritability, and feelings of hopelessness, helplessness and worthlessness (AR 142). A mental status examination revealed that she was alert and oriented and her speech was coherent and goal directed (AR 144). She had a depressed mood, blunt affect, and her insight and judgment appeared to be questionable by history, but her memory appeared to be intact and her intelligence appeared to be average (AR 144). Dr. Su diagnosed her with a mood disorder, opioid dependence, and assigned her a Global Assessment of Functioning (GAF) score of 50 (AR 144).[1] She was prescribed Wellbutrin for depression, Topamax for mood instability, and outpatient psychiatric treatment (AR 145).

On June 5, 2003, Roger Glover, Ph.D., a state agency reviewing psychologist, completed a Mental Residual Functional Capacity Assessment form (AR 160-161). Dr. Glover concluded that Mancuso was not significantly limited in a majority of areas, but was moderately limited in her ability to understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; and respond appropriately to changes in the work setting (AR 160-161). Dr. Glover opined that Mancuso remained capable of understanding and remembering instructions, concentrating, interacting appropriately with people and adapting to changing

---

[1]The GAF score considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. Scores between 41 and 50 indicate "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *See Diagnostic and Statistical Manual of Mental Disorders: DSM-IV* 34 (4th ed. 2000).

activities within the workplace, maintaining regular attendance and being punctual, and sustaining an ordinary routine without special supervision (AR 162).  In formulating this opinion, Dr. Glover considered Dr. Su's psychiatric assessment in April 2003, and concluded that it was consistent with his residual functional capacity finding (AR 162).  He found that Dr. Su's report concerning Mancuso's abilities in the areas of making occupational adjustments, performance adjustments, personal and social adjustments, and other work related activities was fairly consistent with the other evidence in the file (AR 162).  Dr. Glover concluded that Mancuso was able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairments (AR 162).

On June 11, 2003, Mancuso was seen by Dr. Su and complained of depression and mood swings (AR 169).  She denied suicidal ideation or adverse side affects from her medication (AR 169).  Dr. Su increased her medications (AR 169).

Progress notes dated July 2, 2003 indicate that Mancuso was a "no-show" for individual therapy (AR 169).  On July 10, 2003 Mancuso called and reported that her medications were not working, and that she had been "thrown out" of the house by her husband and was being served with divorce papers (AR 169).  She was assessed with increased stressors, and her name was placed in the cancellation book for an appointment (AR 169).  She called again on August 4, 2003 and reported "many" situational stressors, and suffered from increased depression with occasional suicidal ideations (AR 169).  She had not contacted her therapist yet, and was advised to leave a message for the therapist and use Crisis Services if needed (AR 168).

When seen on August 13, 2003, Mancuso claimed that her medications were not working (AR 168).  She reportedly felt depressed, angry, anxious, frightened and suspicious (AR 168).  She stated she was living with her sister since her husband "threw" her out of the house (AR 168).  Her affect was blunted, but she denied any suicidal ideation (AR 168).  Her medications were increased (AR 168).  Mancuso failed to show for an individual therapy appointment on August 27, 2003 (AR 168).

Mancuso returned to Dr. Su on October 28, 2003 and complained of mood swings and frequent crying spells, but reportedly had "more up[s] than down[s]" (AR 168).  Her affect was noted as irritable and anxious, and Dr. Su diagnosed her with bipolar disorder (AR 168).  Her

Topamax was increased (AR 168).

On December 22, 2003, Mancuso's affect was bright, and her mood was more stable and she appeared less anxious (AR 168). It was noted that her medications were starting to work, and she denied any side effects (AR 168).

On April 6, 2004, Mancuso was tearful, and complained of a depressed mood, trouble sleeping, angry feelings and poor concentration (AR 167). She felt the Topamax was not working (AR 167). Treatment notes indicated that her mood needed to be stabilized, and she needed a sleep aid (AR 167). Increased social activities and daily exercise was discussed, and individual therapy was encouraged (AR 167). Her Topamax was decreased, and Neurontin and Trazadone were added to her medication regime (AR 167).

Finally, on May 26, 2004, Dr. Su completed a medical source statement relative to Mancuso's mental abilities to engage in unskilled work (AR 166). The notation on the form requested Dr. Su to circle a listed ability if, based upon his review of her treatment records and evaluations, Mancuso was not able to perform the listed ability on a regular and continuing basis (AR 166). Dr. Su found that Mancuso could not perform the following listed abilities: maintain attention for extended periods; maintain regular attendance and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted; make simple work related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers; and respond appropriately to changes in the work setting (AR 166).

    B.    *Physical impairments*

Mancuso was seen in the emergency room on March 22, 2003 with a chief complaint of low back pain (AR 138). She described a gradual onset of pain, which became worse upon bending or twisting, but denied any radiation to her legs (AR 138). An x-ray of her lumbosacral spine was negative (AR 140). She was diagnosed with low back muscle strain, prescribed medication, and told to follow-up with her primary care physician (AR 138).

Mancuso was examined by Bradley P. Fox, M.D., on October 22, 2003 (AR 187-188).

She reported that her low back pain was progressing upward, and at times her legs felt numb (AR 188). She also complained of a bunion on her right foot, heel pain and hearing loss (AR 188). On physical examination, she demonstrated full strength at 5/5 throughout, deep tendon reflexes at 2+ bilaterally, strong peripheral pulses, and no peripheral edema (AR 187). She exhibited pain on palpation from the top of her lumbar spine to the sacrum, and straight leg-raising test caused pain in the low back at 50 degrees (AR 187). She was diagnosed with low back pain, bunion, and plantar fascitis (AR 187). Diagnostic studies were scheduled, she was prescribed exercises for heel pain, referred to podiatry for her bunion, and referred to an ENT specialist for her complaints of hearing loss (AR 187).

An x-ray of Mancuso's lumbar spine on October 31, 2003 showed minimal disc space narrowing of the L4-5 intervertebral disc space and minimal marginal spurring at the superior end-plate of L4 (AR 208). An MRI conducted that same date showed a small posterior right paracentral disc protrusion at L5-S1, minor central disc bulging at L4-5 level, and a small synovial cyst at L3-4 (AR 207).

Mancuso was seen by Goffredo Ianiro, D.P.M. on November 11, 2003 for evaluation of her bilateral foot pain (AR 203). Dr. Ianiro found she had marked ankle equinus, was obese, and demonstrated tenderness upon squeezing both heels, as well as upon range of motion of the right great toe (AR 203).

On November 12, 2003, Mancuso was evaluated by Richard C. Mendel, M.D., a neurological surgeon, for evaluation of her back pain (AR 199-201). Mancuso complained of pain located mainly in her low back, but also radiating into her hips and posteriorly down the back of her legs down to her knees, with occasional bilateral leg numbness (AR 199). She reported difficulty bending and doing most activities of daily living (AR 199). Dr. Mendel reviewed her diagnostic studies, and was of the opinion that the right sided disc protrusion was more significant than characterized in the MRI report (AR 202). Physical examination showed full upper and lower extremity strength at 5/5, no paravertebral muscular spasms, positive straight leg-raising on the right at 30 degrees, limited range of motion in her spine, and intact sensory testing throughout both lower extremities (AR 200). Dr. Mendel diagnosed her with a herniated lumbar disc and referred her to Dr. Bingham for an epidural steroid injection and

suggestions regarding intra-discal treatment (AR 201).

Mancuso underwent a right foot bunionectomy in December 2003, and recovered extremely well (AR 173). Six weeks post surgery she was able to wear shoes, had no complaints, and exhibited "excellent" range of motion (AR 173).

In December 2003, Mancuso had a lumbar epidural injection performed by Dr. Bingham which she claimed afforded her no relief, and she was unable to receive a second injection due to a change in insurance coverage (AR 194). When seen by Jonathan A. Borden, M.D., on January 24, 2004 she reported total spinal pain (AR 194). A neurological examination revealed lower extremity strength at 5/5, deep tendon reflexes at 2+ bilaterally, negative straight leg-raising bilaterally, and a full range of motion of her spine (AR 194). Dr. Borden opined that her symptoms were non-radicular and he recommended conservative treatment rather than surgery (AR 194).

In February 2004, Mancuso underwent surgery for removal of a right heel spur and by May 2004 was doing extremely well (AR 171, 189-192). She continued to complain of left foot pain and was scheduled for surgery on June 2, 2004 (AR 171).

Mancuso returned to Dr. Fox on June 16, 2004 complaining of back pain radiating into her hip and a "little" into her leg, with associated numbness and tingling (AR 182). She claimed that it was excruciating to lie down, and leaned down to decrease the symptoms (AR 182). Dr. Fox reported that she was leaning over the table due to pain, had a hard time sitting and standing, and he did not attempt a range of motion test due to her limited mobility (AR 182). Mancuso was diagnosed with chronic back pain with an acute flare, and was prescribed medication (AR 182). Dr. Fox considered a referral to Pittsburgh if her condition did not improve (AR 182).

C.   *Hearing testimony*

Mancuso and Joseph J. Kuhar, a vocational expert, testified at the hearing held by the ALJ on July 1, 2004 (AR 29-51). With respect to her physical impairments, Mancuso testified she had a hearing loss, left foot pain and back pain (AR 35, 37, 42). Mancuso further testified that she suffered from depression, mood swings, and concentration problems (AR 39). She claimed being around people bothered her, and she did not leave her house much (AR 39-40). She further claimed she was unable to work due to her depression, in that she was unable to get

out of bed six to eight times per month (AR 40). Mancuso also testified that she had crying spells and became easily frustrated (AR 43). She had trouble sleeping due to depression and back pain (AR 44). She indicated she could only stand for approximately one-half hour, but would be unable to do so repetitively, and had problems getting out of a seated position (AR 46).

The ALJ asked the vocational expert if work existed for an individual of Mancuso's age, education and past work experience, who was limited to sedentary work which involved routine repetitious tasks with one- or two-step instructions performed in a low stress environment, requiring few decisions or more than occasional contact with the public and coworkers (AR 48). The vocational expert testified that such an individual could perform work as an assembler, food sorter, and hand packer (AR 48).

Following the hearing, the ALJ issued a written decision which found that Mancuso was not eligible for SSI benefits within the meaning of the Social Security Act (AR 15-21). Mancuos's request for an appeal with the Appeals Council was denied making the ALJ's decision the final decision of the Commissioner (AR 7-10). She subsequently filed this action.

## II. STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)); *see Richardson v. Parales,* 402 U.S. 389, 401 (1971). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson,* 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.,* 48 F.3d 114, 117 (3d Cir. 1995).

## III. DISCUSSION

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step evaluation process to determine when an individual meets

this definition:

> In the first two steps, the claimant must establish (1) that he is not engaged in "substantial gainful activity" and (2) that he suffers from a severe medical impairment. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). If the claimant shows a severe medical impairment, the [Commissioner] determines (3) whether the impairment is equivalent to an impairment listed by the [Commissioner] as creating a presumption of disability. *Bowen*, 482 U.S. at 141. If it is not, the claimant bears the burden of showing (4) that the impairment prevents him from performing the work that he has performed in the past. *Id.* If the claimant satisfies this burden, the [Commissioner] must grant the claimant benefits unless the [Commissioner] can demonstrate (5) that there are jobs in the national economy that the claimant can perform. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3rd Cir. 1985).

*Jesurum*, 48 F.3d at 117. The ALJ resolved Mancuso's case at the fifth step. At step two, the ALJ determined that her degenerative disc disease, mood disorders and borderline intellectual functioning were severe impairments, but determined at step three that she did not meet a listing (AR 16).[2] At step four, the ALJ determined that she retained the residual functional capacity to perform work that did not require exertion above the sedentary level, or more than simple, routine, repetitious tasks, with one- or two-step instructions, performed in a low stress environment, defined as work requiring few decisions, or more than occasional contact with the public (AR 17). At the final step, the ALJ concluded that Mancuso could perform the jobs cited by the vocational expert at the administrative hearing (AR 19). The ALJ additionally determined that her allegations regarding her limitations were not totally credible (AR 20). Again, we must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Mancuso challenges the ALJ's analysis and conclusions concerning both her mental and physical impairments. In essence, she argues that both impairments preclude her from working and that the ALJ's conclusion to the contrary is unsupported by substantial evidence.

    *A.    Mental impairments*

Mancuso's main criticism stems from the ALJ's rejection of Dr. Su's medical opinion. We agree that the ALJ's analysis is fundamentally flawed such that his decision is not supported

---

[2]Mancuso does not challenge the ALJ's further findings that her history of abusing pain medication and hearing loss were not severe impairments (AR 16).

by substantial evidence.

     A cardinal principle guiding disability eligibility determinations is that the opinion of a treating physician is entitled to great weight and can only be rejected on the basis of contrary medical evidence. *See Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988). The ALJ "may not substitute his personal reaction to [c]laimant's responses or physical appearance for the opinion of the treating physicians" and may not "set his own expertise against that of a physician who presents competent evidence." *Gilliland v. Heckler*, 786 F.2d 178, 184 (3d Cir. 1986); *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985). Because of his or her long standing relationship with the claimant, the opinion of a treating physician is entitled to more weight than that of a physician who examined the claimant only once or not at all. *See Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993). "[A] finding of residual capacity for work which conflicts with such an opinion and is made without analytical comment or record reference to contradictory evidence is not supported by substantial evidence." *Gilliland*, 786 F.2d at 183. Finally, where an ALJ chooses to reject the opinion of a treating physician, he must adequately explain in the record his reasons for doing so. *Sykes v. Apfel*, 228 F.3d 259, 266 (3rd Cir. 2000) ("Where the Secretary is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence.").

     In this case, the ALJ declined to give Dr. Su's opinion controlling weight because the ALJ felt it was: (1) not controlling on the issue of disability; (2) without adequate explanation; (3) inconsistent with his own treatment notes; and (4) inconsistent with the medical opinion of Dr. Glover, the state agency reviewing psychologist (AR 18). Instead, the ALJ credited Dr. Glover's assessment on the grounds that it was more thorough and consistent with the objective medical evidence (AR 18). Mancuso contends, and we agree, that the ALJ's analysis is unsupportable to the extent he found that Dr. Su's opinion was without adequate explanation and inconsistent with his own treatment notes.

     One of the basis for rejecting Dr. Su's opinion as articulated by the ALJ was that Dr. Su's medical assessment was conclusory and unsupported by the objective medical evidence (AR 18). Here, although the form completed by Dr. Su did not reference specific medical evidence, the form itself contained instructions which demonstrated that his opinion was based upon his review

of her treatment records and his evaluations (AR 166). Moreover, attached to the form itself was Dr. Su's treatment notes for the time period from April 10, 2003 through May 19, 2004 (AR 166-169). Therefore, the ALJ's conclusion that Dr. Su's opinion was without adequate explanation is not supported by substantial evidence.

The ALJ further implicitly rejected Dr. Su's opinion as being inconsistent with his own treatment notes. The ALJ concluded that "[t]he treatment records show limitations, but none that would prevent the simple, low-stress work specified in the RFC adopted here" (AR 18). A review of the treatment notes, however, fail to reveal any inconsistency. For example, Dr. Su's treatment notes reflect that when initially seen, Mancuso had insomnia, poor energy level, poor motivation, anhedonia,³ difficulty concentrating, increased anxiety and irritablity, and feelings of hopelessness, helplessness and worthlessness (AR 142). Dr. Su found her mood depressed her affect blunted (AR 144). In fact, he assigned her a GAF score of 50, which indicates serious symptoms, such as an inability to keep a job. *See Diagnostic and Statistical Manual of Mental Disorders: DSM-IV* 34 (4th ed. 2000). In June 2003 she complained of depression and mood swings (AR 169). In August 2003 she suffered from increased depression with occasional suicidal ideations, felt angry, anxious, frightened and suspicious (AR 168-169). Dr. Su noted that her affect was blunted (AR 168). In October 2003 she complained of mood swings and frequent crying spells, and her affect was noted as irritable and anxious (AR 168). While she appeared more stable and less anxious in December 2003, her last visit showed she was tearful, depressed, and suffering from sleep disturbances, angry feelings and poor concentration (AR 167).

Equally problematic is the ALJ's reliance on Dr. Glover's opinion as a basis for rejecting Dr. Su's opinion. The ALJ reasoned that Dr. Glover's opinion was the most thorough of record and more consistent with the objective medical evidence, including Dr. Su's treatment records (AR 18). Dr. Glover concluded that Mancuso was not significantly limited in a majority of areas, and was only moderately limited in her ability to understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; and respond

---

³"Anhedonia" is a total loss of feeling of pleasure in acts that normally give pleasure. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 89 (29th ed. 2000).

appropriately to changes in the work setting (AR 160-161). In making this assessment, Dr. Glover indicated that he found Dr. Su's report concerning Mancuso's abilities in the areas of making occupational adjustments, performance adjustments, personal and social adjustments, and other work related activities was fairly consistent with the other evidence in the file (AR 162). A review of the record reveals, however, that Dr. Glover's characterization of Dr. Su's opinion upon which he substantially relied was factually incorrect. Nowhere in his April 2003 evaluation does Dr. Su reference or discuss Mancuso's ability to make occupational, performance, personal or social adjustments (AR 142-143). Consequently, we are of the opinion that the ALJ's decision to reject Dr. Su's opinion for the reasons he proffered was not supported by substantial evidence.

    *B.    Physical impairments*

The ALJ examined the medical evidence of record relative to Mancuso's physical impairments and found that "[t]hese conditions provide reasonable support for the claimant's testimony of pain, but [not] to a disabling degree" (AR 17). He concluded that while she might be expected to experience heel pain, the record did not show a condition that would prevent sedentary exertion for 12 consecutive months (AR 17-18). The ALJ further concluded that while her spinal condition provided a reasonable basis for back pain, she was capable of a fair range of household activities and "should" be able to sustain sedentary work (AR 18).

The ALJ cites to exhibit 7E, which is a Daily Activities Questionnaire completed by Mancuso, in support of his conclusion that she engages in a "fair range of household activities" (AR 18, 117-120). In this Questionnaire, Mancuso stated that she lived with her boyfriend, was able to "sometimes" clean house with her boyfriend's help, was able to shop once a month, cook simple meals, attend to her personal needs "sometimes," and drive, although she had not driven for about six months (AR 119). The fact that Mancuso may sporadically engage in certain household chores does not, in and of itself, support the ALJ's conclusion that she is capable of substantial gainful activity. *See Smith v. Califano*, 637 F.2d 968, 971-72 (3rd Cir. 1981) ("Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity. ... It is well established that sporadic or transitory activity does not disprove disability."). Moreover, we observe that the record, when fairly read in its entirety,

reveals that Mancuso's "fair range of household activities" are more limited than that represented by the ALJ. For example, Mancuso stated that while she can cook a meal, she must sit down and take a break; she is unable to use a vacuum cleaner; she rests while shopping; and receives "a lot" of help with the laundry (AR 93-94).

Finally, we note that, although the ALJ recites the results of Mancuso's diagnostic studies in support of his conclusion, he has failed to explain his basis for rejecting other medical evidence arguably supportive of her claim of disability. As the Third Circuit explained in *Cotter v. Harris*, 642 F.2d 700, 705 (3rd Cir. 1981), the ALJ must mention relevant evidence which clearly supports the claim and give his or her reasons for rejecting such evidence. In the absence of such an indication, "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Id*. In this case, the ALJ's decision contains no discussion of the following evidence: when seen by Dr. Fox in October 2003, she exhibited pain on palpation from the top of her lumbar spine to the sacrum, and straight leg-raising test caused pain in the low back at 50 degrees (AR 187). Dr. Mendel reviewed her diagnostic studies in November 2003 and was of the opinion that the right sided disc protrusion was more significant than characterized in the MRI report (AR 202). Mancuso reported difficulty bending and doing most activities of daily living, and on physical examination, Dr. Mendel noted positive straight leg-raise testing on the right at 30 degrees and a limited range of motion in her spine (AR 199, 200). In June 2004, Mancuso reported excruciating pain, and Dr. Fox reported that she was leaning over the table due to pain, had a hard time sitting and standing, and he did not attempt a range of motion test due to her limited mobility (AR 182).

## IV. CONCLUSION

Based upon the foregoing reasons, Mancuso's motion for summary judgment shall be denied, and the Commissioner's motion for summary judgment shall be denied. The matter shall be remanded to the Commissioner for further proceedings consistent with this Memorandum Opinion. The ALJ is free to seek additional evidence and/or call a vocational expert if he feels it is necessary. An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CRYSTAL L. MANCUSO, | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 04-293 Erie |
| v. | ) |
| JO ANNE BARNHART,<br>Commissioner of Social Security, | ) |
| Defendant. | ) |

## ORDER

AND NOW, this 31st day of October, 2005, for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Plaintiff's Motion for Summary Judgment [Doc. No. 8] is DENIED and the Defendant's Motion for Summary Judgment [Doc. No. 10] is DENIED. The case is hereby REMANDED to the Commissioner of Social Security for further proceedings consistent with the accompanying Memorandum Opinion. The clerk is directed to mark the case closed.

                                                          s/ Sean J. McLaughlin
                                                          United States District Judge

cc: All parties of record.